# ORIGINAL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES-GENERAL

Priority ✓
Send ✓
____ Clsd
____ Enter
____ JS-5/JS-6
____ JS-2/JS-3

**Case No.:** CV 03-3272-GHK(JTLx)        **Date:** June 9, 2004

**Title:**   Douglas Sands v. eUniverse, Inc., et al.
================================================================
**DOCKET ENTRY**
================================================================
**PRESENT:** Hon. <u>George H. King</u>, United States District Judge

| | |
|---|---|
| <u>Beatrice Herrera</u> | <u>None</u> |
| Deputy Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| None | None |

**PROCEEDINGS:**
(1)   Defendant eUniverse, Inc.'s Motion to Dismiss 4%
(2)   Defendant Greenspan's Motion to Dismiss 5%
(3)   Defendants Brewer, Goldenberg & Lipp's Motion to Dismiss 5%
(4)   Defendant Varraveto's Motion to Dismiss and to Strike 5%
(5)   Defendant Carrigan's Motion to Dismiss 5%
(6)   Defendant Merdinger, Fruchter, Rosen & Company P.C.'s Motion to Dismiss 5%

   This matter comes before us on the above-titled motions. We conclude that this matter is appropriate for decision without oral argument. <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15. After considering the parties' briefs filed in support of and in opposition to the motions, we rule as follows:

## I.   BACKGROUND

   The facts in this case are known to the parties, and we will not repeat them except as is necessary to our discussion. The relevant procedural history is as follows: On May 9, 2003, Plaintiff Douglas Sands filed a class action complaint for violations of federal securities laws against eUniverse, Inc., Brad Greenspan, and Joseph Varraveto. On June 30, 2003, Defendant eUniverse, Inc. filed a "Notice of Related Cases and Notice of Pendency of Other Actions" indicating that there were seven related cases pending in the Central District which were based on the same events and raised substantially identical questions of law and fact. On July 9, 2003, we issued an Order

DOCKETED ON CM

JUN 1 0 2004

BY

77

010

to Show Cause re: Consolidation ordering the parties to show cause why the eight cases should not be consolidated under the low number action, and all of the other seven actions dismissed without prejudice. The order also instructed the parties to meet and confer regarding the appointment of lead plaintiff and selection of lead plaintiff's counsel. On October 15, 2003, pursuant to a stipulation by the parties, we ordered that (1) the eight related actions be consolidated under the low number action and the remaining actions be dismissed without prejudice; (2) Gregory Whitten serve as lead plaintiff in the consolidated actions; and (3) Kaplan Fox & Kilsheimer LLP, counsel to Mr. Whitten, serve as lead counsel in the consolidated actions.

On December 17, 2003, Plaintiffs filed an Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("ACC" or "complaint") against eUniverse, Inc. (hereinafter "eUniverse" or "the Company"), six of its current and former officers (hereinafter "the Individual Defendants"),[1] and Merdinger, Fruchter, Rosen & Company, P.C. (hereinafter "MFRC"),[2] the Company's auditor. The ACC alleges three counts: (1) violation of Section 10(b) of the Securities and Exchange Act of 1934 (hereinafter "the Exchange Act") and Rule 10b-5(b) against all Defendants; (2) violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against all Defendants; and (3) violation of Section 20(a) of the Exchange Act against the Individual Defendants.

On January 13, 2004, pursuant to the parties' stipulation, we ordered the parties to abide by the following briefing schedule for all motions by Defendants related to the ACC: motions filed by February 17, 2004; oppositions filed by March 18, 2004; and replies filed by April 1, 2004.

This order addresses six separate motions to dismiss, each filed on February 17, 2004, by: (1) Defendant eUniverse (2) Defendant Greenspan; (3) Defendants Brewer, Goldenberg, and Lipp; (4) Defendant Varraveto; (5) Defendant Carrigan; and

---

[1]These Defendants are Brad Greenspan, the Company's former Chief Executive Officer and Chairman of the Board of Directors; Brett Brewer, the Company's President and Director; Joseph Varraveto, the Company's former Executive Vice President and Chief Financial Officer; Adam Goldenberg, the Company's Chief Operating Officer; Christopher Lipp, the Company's Senior Vice President and General Counsel; and Michael Carrigan, the Company's former Controller. ACC ¶¶22-27.

[2]Plaintiffs sue MFRC under its former name, Merdinger, Fruchter, Rosen, & Corso, P.C.

(6) Defendant MFRC.

## II.   **LEGAL STANDARD**

### A.   **Motion to Dismiss**

Defendants move to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).[3]  On a motion to dismiss under Rule 12(b)(6), we must accept the complaint's allegations as true and construe them in the light most favorable to Plaintiffs.  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir. 1999).  Dismissal of a complaint is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In reviewing a motion to dismiss, we may consider documents attached to the complaint, documents incorporated by reference in the complaint, and matters of which we take judicial notice. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).[4]

---

[3]Defendant Carrigan also moves to dismiss the complaint under Fed. R. Civ. P. 8(a), which requires pleadings to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  This standard is a liberal one, requiring only that the plaintiff give the defendant fair notice of the claim and the grounds for making the claim.  Leatherman v. Tarrant County Narcotics Intell. and Coord. Unit, 507 U.S. 163, 168 (1993).  "[D]ismissal of a complaint for noncompliance with Rule 8 is usually reserved for cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  In re Real Estate Assocs. Ltd. Partnership Litig., 223 F.Supp.2d 1142, 1146 (C.D. Cal. 2002), quoting ReSource N.E. of Long Island, Inc. v. Town of Babylon, 80 F.Supp.2d 52, 57 (E.D. N.Y. 2000).  Although the complaint in this case is lengthy and somewhat repetitive, the length of the complaint is not unreasonable given the number of defendants involved and the specificity requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act.  The complaint contains a table of contents and headings which clearly lay out the false and misleading statements alleged, the scienter allegations, and the claims.  We therefore find that the complaint satisfies the liberal Rule 8(a) standard and deny Carrigan's motion to dismiss on this ground.

[4]Both sides have requested that we take judicial notice of various SEC filings and related documents.  To the extent we rely on these documents in our analysis, we take judicial notice of
(continued...)

## B.    Securities Fraud

In 1995, in an effort to deter abusive and frivolous securities fraud claims, Congress passed the Private Securities Litigation Reform Act ("PSLRA").  <u>Silicon Graphics</u>, 183 F.3d at 973.  The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint "plead with particularity both falsity and scienter."  <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1084 (9th Cir. 2002).

In order to plead falsity under the PSLRA, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

In order to plead scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In the Ninth Circuit, the "required state of mind" is "deliberately reckless or conscious misconduct."  <u>Silicon Graphics</u>, 183 F.3d at 974.  In determining whether Plaintiffs have pled facts demonstrating a strong inference of scienter, "the court must consider <em>all</em> reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."  <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 897 (9th Cir. 2002).[5]

---

[4](...continued)
them pursuant to Fed. R. Evid. 201.

[5]Plaintiffs argue that under the Ninth Circuit decision in <u>No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.</u>, 320 F.3d 920, 931 (9th Cir. 2003) ("America West"), the court may consider only reasonable inferences in <em>favor</em> of the Plaintiffs.  But <u>America West</u> itself quotes the language from <u>Gompper</u>, <u>see</u> <u>id.</u> at 938, and could not have overruled an earlier Ninth Circuit case in any event.

4

III. DISCUSSION

    **A.    Count 1: Violations of § 10(b) of the Exchange Act and Rule 10b-5(b)**

    In Count I of the ACC, Plaintiffs allege that Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5(b).[6]  Section 10(b) states, in relevant part,

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any
> facility of any national securities exchange . . . [t]o
> use or employ, in connection with the purchase or sale
> of any security registered on a national securities
> exchange . . . ., any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

15 U.S.C. § 78j(b).

    Rule 10b-5(b) provides that it is unlawful to use "any means or instrumentality of interstate commerce, or . . . the mails or . . . any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

    To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts establishing: (1) a misrepresentation or omission of material fact; (2) scienter; (3) reliance; and (4) resulting damages.  See Paracor Finance, Inc. v. General Electric Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996).  Defendants' motions to dismiss challenge only the first two of these elements: whether Defendants made false statements of, or omitted, material facts and whether this was done with scienter. We address each of these elements in turn.

---

    [6]Because Plaintiffs' allegations with respect to eUniverse's accountant, MFRC, differ from the allegations with respect to the Company and the Individual Defendants, we address those claims in a separate section.

1.   False Statements or Omissions

In order to properly plead that Defendants are responsible for false or misleading statements or omissions under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Defendants dispute the sufficiency of Plaintiffs' allegations regarding falsity in several ways. First, although no Defendant challenges the actual falsity of the Company's quarterly financial results for the first three quarters of Fiscal Year 2003 ("FY03"), the Individual Defendants dispute whether they are individually liable for these false statements. In order to resolve this issue, we must consider the applicability of the "group published information" presumption. Certain Defendants also challenge the sufficiency of Plaintiffs' allegations regarding (1) the Form 10-Q certifications for the first three quarters of FY03 ("Form 10-Q Certifications"); (2) the April 16, 2003 press release; and (3) the Company's Form 10-K for Fiscal Year 2002 ("2002 Form 10-K").

a.   *FY03 Quarterly Financial Results*

Plaintiffs allege that the Company's press releases announcing the financial results for the first three quarters of FY03 contained false statements. See ACC ¶¶ 69-82.[7]

Inasmuch as Defendants Varraveto and Greenspan are alleged to have made various statements incorporating the false financial results for the first three quarters of FY03 (see, e.g., ACC ¶¶ 70, 75, 79, 80), we find these allegations sufficient to satisfy the falsity element as to each of these Defendants.

Although Defendants Brewer, Goldenberg, Lipp, and Carrigan are not alleged to have been quoted in the press releases, they may still be held liable for false statements contained in the publication under the "group published information" presumption. Under this presumption, false or misleading information conveyed in prospectuses, registration statements, annual reports, press releases, or other "group published information" are presumed to be the collective actions of the corporate officers. Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987). To rely on this presumption, "plaintiffs' complaint must contain allegations that . . . [the defendant] either participated in the day-to-day corporate activities or had a special relationship

---

[7]Defendant eUniverse does not contest its responsibility for these false statements.

with the corporation, such as participation in preparing or communicating group information at particular times." <u>In re GlenFed, Inc. Sec. Litig.</u>, 60 F.3d 591, 593 (9th Cir. 1995). In addition, "the group pleading presumption rests on an assumption that defendants within the group are functionally related to the alleged fraudulent activity." <u>Smith v. Network Equipment Technologies, Inc.</u>, 1990 WL 263846, *5 (N.D. Cal. Oct. 19, 1990); <u>see also</u> <u>Molinari v. Symantec Corp.</u>, 1998 WL 78120, *10 (N.D. Cal. Feb. 17, 1998) (in order to invoke the "group published" material exception, the complaint must contain facts implying that the defendants were part of group of officers or directors "who are alleged to have day to day control over the company and whose functional role is such that they can be presumed to be involved with the drafting of group published material") (internal quotations omitted).

Although it is an open question in the Ninth Circuit whether the group publication doctrine survives enactment of the PSLRA, we follow the majority of the district courts in concluding that it does. <u>See, e.g.,</u> <u>In re Adaptive Broadband Sec. Litig.</u>, 2002 WL 989478, *18 (N.D. Cal. Apr. 12, 2002); <u>In re Guess?, Inc. Sec. Litig.</u>, 174 F.Supp.2d 1067, 1079-80 (C.D. Cal. 2001); <u>In re Stratosphere Corp. Sec. Litig.</u>, 1 F.Supp.2d 1096, 1108 (D. Nev. 1998); <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 970 F.Supp. 746, 759 (N.D. Cal. 1997).

Here, the press releases announcing the financial results for the first three quarters of FY03 are unquestionably group published information. <u>See</u> <u>Wool</u>, 818 F.2d at 1440. Therefore, officers and directors with direct involvement in the day-to-day affairs of the Company and in the Company's financial statements may be held responsible for false statements contained in the press releases under the group publication presumption. Plaintiffs sue the top level officers of the Company, including Brett Brewer, the Company's President and Director; Adam Goldenberg, the Company's Chief Operating Officer ("COO"), Joseph Varraveto, the Company's former Chief Financial Officer ("CFO"), and Christopher Lipp, the Company's Vice President and General Counsel; as well as Michael Carrigan, the Company's former Controller. Plaintiffs allege that "[a]ll of the Individual Defendants, by virtue of their high-level positions with the Company, were directly involved in the day-to-day operations of the Company." ACC ¶ 30. Plaintiffs further allege that the Individual Defendants (1) were involved in drafting, preparing, reviewing and/or disseminating the false statements (ACC ¶35); (2) approved or ratified those statements (ACC ¶ 35); (3) had the ability and opportunity to prevent the issuance of those statements or to cause them to be corrected (ACC ¶ 36); and (4) were privy to confidential, proprietary information concerning

7

the Company (ACC ¶ 31). In addition, the Company is alleged to be relatively small, with 164 full time employees at the beginning of the Class Period and approximately 300 employees by the end of the Class Period. ACC ¶ 32. We conclude that these allegations are sufficient at this stage of the litigation to invoke the group publication presumption with respect to each of the Individual Defendants. See Stanley v. Safeskin, 2000 WL 33115908, *4 (S.D. Cal. Sept. 15, 2000) (applying group publication presumption to President/CEO; Vice President/CFO; Vice President, Sales; and Vice President/Controller/Secretary where Plaintiffs alleged that Defendants participated in daily activities, took part in the preparation of the reports, and attended meetings, many of which discussed the company's financial condition); Stratosphere Corp., 1 F.Supp.2d at 1108 (applying group publication presumption where Plaintiffs alleged that Defendants, due to their high level positions, were involved in company's day-to-day operations at the highest levels, were privy to confidential information, directly participated in company management, and were involved in drafting, reviewing and/or disseminating the false and misleading statements).

    Indeed, in these circumstances, we may presume that these top-level officers were involved not only in the Company's day-to-day affairs but also in its financial statements. See Wool, 818 F.2d at 1440 (finding Senior Vice President/COO; President/CEO; and Vice President/Controller part of the "narrowly defined group of officers" with direct involvement both in the Defendant Company's day-to-day affairs and its financial statements). Although Carrigan is a lower level officer, application of the group publication presumption to him is appropriate because, as Controller, he was closely involved in the Company's accounting operations. See ACC ¶ 27(c). Similarly, Lipp, as General Counsel, would be expected to have direct involvement in SEC compliance and, as such, may be held responsible for reports of SEC filings to investors and the general public. See In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F.Supp.2d 527, 546 (S.D. Ohio 2000) (holding allegations that the General Counsel and other "high level officers" had prepared and/or reviewed the false press releases and SEC filings, had the ability to speak on behalf of the company, had access to non-public adverse information regarding the company, and were "hands-on" managers, sufficient to invoke the group published doctrine).

    We therefore conclude that eUniverse and each of the Individual Defendants can be held responsible for the false statements contained in press releases announcing the quarterly financial results for the first three quarters of FY03. We

nonetheless proceed to Defendants' remaining arguments regarding other alleged false statements.

b.   *Form 10-Q Certifications*

Defendant Varraveto moves to strike Plaintiffs' allegations concerning his certifications of eUniverse's Form 10-Qs for the second and third quarters of FY03 because Plaintiffs failed to plead how the alleged representations were false and misleading.

The complaint alleges several misstatements contained in Varraveto's certifications.  First, Varraveto allegedly certified that "the financial statements, and other financial information in [the] quarterly report[s], fairly represent[ed] in all material respects the financial condition, results of operations and cash flows of the registrant." ACC ¶84 (alteration in original).  We find Plaintiffs' allegations that eUniverse restated its financial results for the quarters at issue sufficient to show that these statements in Varraveto's certifications were false.

Plaintiffs also allege that Varraveto certified that he and Greenspan (1) were "responsible for establishing and maintaining disclosure controls and procedures" for the Company and "[d]esigned such disclosure controls and procedures to ensure that material information relating to the Company . . . was made known to them . . .; and . . . [e]valuated the effectiveness of the Company's disclosure controls and procedures within 90 days of the filing date of each quarterly report" (ACC ¶ 84); and (2) disclosed to independent auditors and the audit committee "[a]ll significant deficiencies in the design or operation of the internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data" and "[a]ny fraud . . . that involves management or other employees who have a significant role in the registrant's internal controls" (ACC ¶ 85).  According to the complaint, these statement were false and misleading because "eUniverse overstated its revenue and net income in violation of GAAP. . . ." ACC ¶86. We conclude that Plaintiffs' allegations are sufficient to raise an inference that at least one of these certifications was false. While the allegations do not *necessarily* prove the falsity of the statements, the Company's overstatement of revenue at least raises an inference that Varraveto and Greenspan either did not design disclosure controls and procedures and/or did not evaluate their effectiveness within 90 days of each quarterly report.  If they had done so, they could have discovered the accounting violations.  Thus, the statement that they disclosed significant deficiencies in the design or operation of internal controls

and/or fraud involving management or other employees would, at
least, raise an inference of falsity.

　　Accordingly, we find that Plaintiffs have adequately alleged
falsity with respect to the Form 10-Q certifications at this
stage.

　　　　　　c.　*April 16, 2003 Press Release*

　　Defendant Varraveto likewise moves to strike Plaintiffs'
allegations concerning the falsity of the April 16, 2003 press
release.　According to the complaint, eUniverse distributed a
press release in which it announced the lowering of its earnings
forecast for FY03.　The press release allegedly stated, in part:

> eUniverse . . . announced that the Company expects
> revenue and net income for the fourth quarter of fiscal
> 2003 to be lower than previously forecasted.
> 　"The fourth quarter was a challenging quarter for
> eUniverse and the persistent weakness in the general
> economy, caused in part by recent international events,
> negatively impacted our operating results this period,"
> said Joe Varraveto, CFO of eUniverse.　"We saw a
> consumer retreat as events overseas escalated during
> the quarter.　This put pressure on our top line growth
> rate and our margins as customer acquisition costs
> temporarily increased outside of our target range
> during the quarter.　Additionally, we absorbed certain
> higher-than-planned operating costs that are associated
> with our rapid growth of the past six months.　We have
> moved quickly to counterbalance the operating
> challenges presented by the economy and our rapid
> internal expansion, and to further refine our operating
> infrastructure and implement operating efficiencies.
> We continue to be optimistic about the medium- and
> long-term prospects for eUniverse and have several
> initiatives in progress that we expect to provide a
> catalyst for our continued growth."
> 　eUniverse now expects revenue for the fourth
> quarter to be in the range of $19 million or $21
> million, compared to previous guidance of $23 million
> provided on January 30, 2003.　Net income and diluted
> earnings per share for the quarter are also expected to
> be below the previous guidance of $3.5 million and
> $0.10, respectively.　The Company expects to release
> full first quarter operating results on May 22, 2003.

ACC ¶ 88.　Plaintiffs allege that "[t]he statement in paragraph
88 was false because it failed to disclose the true reasons for

eUniverse's earnings shortfall" which was "not due to weakness in
the general economy or any change in the market but was directly
related to the improper accounting practices that had inflated
the Company's past earnings and revenues." ACC ¶ 89.  Plaintiffs
further allege that the Company admitted on its Fiscal Year 2003
Form 10-K that the 2003 shortfall was in part attributable to
"deficiencies in the Company's internal controls," including
"insufficient supervision and oversight of the Company's
accounting systems and personnel" and "a poorly designed, non-
integrated accounting system." ACC ¶ 6.  Plaintiffs' allegations
of falsity appear to go only to those portions of the press
release that purport to provide the reasons for the earnings
shortfall.  We nonetheless conclude that Plaintiffs' allegations
are sufficient to raise an inference that Varraveto's statement
omitted material information.  Accordingly, we hold that
Plaintiffs have adequately alleged a material omission with
respect to the reasons for the Company's lowering of its earnings
forecast.

> d.   *2002 Form 10-K*

    Defendants also challenge Plaintiffs' allegations of falsity
with respect to the 2002 Form 10-K.  Although the Company's
financial results for Fiscal Year 2002 ("FY02") were never
restated or otherwise revised, Plaintiffs allege that the
Company's 2002 Form 10-K contained false and misleading
statements because the company was artificially inflating its
financial results by: (1) automatically billing customers for
services and/or products that the customers had not ordered;
(2) recognizing revenue on products that had not been shipped;
(3) recognizing advertising revenue when the Company's customer
had no obligation to pay until the customer's client paid;
(4) failing to record adequate reserves for returns; (5) delaying
credits due to customers; (6) manipulating its cash flow; and
(7) failing to accrue for obligations incurred as of the
reporting period to understate expenses and overstate earnings.
ACC ¶ 50.  These allegations, in turn are based on statements by
confidential witnesses.[8]

---

    [8]Plaintiffs also provide a table setting forth the alleged
amounts by which revenue and income for FY02 were overstated.
See ACC ¶ 67.  However, inasmuch as Plaintiffs fail to specify
how these numbers were calculated, they are insufficient to
establish that the 2002 Form 10-K was false or misleading.  See
America West, 320 F.3d 920, 931 (9th Cir. 2003) (when an
allegation of falsity is made on information and belief, the
complaint must allege all facts on which the belief is formed).

"Reliance on confidential witnesses is not *per se* improper
under the PSLRA, notwithstanding its requirement that a plaintiff
plead 'all facts' when making allegations based on information
and belief." In re Northpoint Communications Group, Inc. Sec.
Litiq., 221 F.Supp.2d 1090, 1097 (N.D. Cal. 2002) ("Northpoint
II"). When relying on unnamed sources, however, a Plaintiff must
provide enough particularized detail to support "a reasonable
conviction in the informant's basis of knowledge." Id.; see also
In re Lockheed Martin Corp. Sec. Litiq., 272 F.Supp.2d 928, 940
(C.D. Cal. 2002) (Plaintiff must plead sufficient particularized
detail to support "the probability that a person in the position
occupied by the source would possess the information alleged.").

Here, Plaintiffs' allegations from confidential witnesses
are insufficient to show that the 2002 Form 10-K was false.
First, Plaintiffs fail to provide any dates as to when the
alleged improprieties occurred. Without such dates, it is
impossible to determine whether these activities had any bearing
on the FY02 financial results. Second, many of Plaintiffs'
allegations fail to provide sufficient corroborating detail.
Plaintiffs do not provide job descriptions or other information
explaining, for example, how a "marketing employee" or "website
manager" would know that the Company failed to pay its bills on
time (see ACC ¶ 64) or how customer service representatives would
know that eUniverse debited customer credit cards immediately
upon receipt of an order pursuant to an unstated policy of
recognizing revenue on products before they were shipped, in
violation of GAAP (see ACC ¶¶ 57, 58).[9] In order to properly
plead these allegations, Plaintiffs must provide facts showing
how an individual in the witness's position would know the
information alleged. Lockheed Martin, 272 F.Supp.2d at 940.
Finally, even if we were to credit the alleged statements of the
confidential witnesses, there are no allegations suggesting that

---

[9]We distinguish the allegations identified above from
allegations that customer service representatives witnessed the
Company's practice of billing customers for products not ordered.
See ACC ¶ 56. In the latter case, the complaint specifically
alleges that the customer service representatives themselves
received calls from customers complaining about their credit
cards being debited for products they had not ordered. See ACC
¶¶ 56(a),(b). In contrast to these allegations indicating
first-hand knowledge, Plaintiffs do not explain how customer
service representatives would know that customers' credit cards
were debited immediately upon receipt of an order (see ACC ¶ 57)
or how they would know that the Company had a policy of
recognizing revenue on orders before products were shipped (see
ACC ¶ 58).

these practices were widespread and significant enough to result in materially false financial statements.

Accordingly, we conclude that Plaintiffs have failed to sufficiently allege falsity with respect to the 2002 Form 10-K. However, because Plaintiffs have adequately alleged that the Company and each of the Individual Defendants are responsible for at least one false statement, we conclude that Plaintiffs have satisfied this element of their securities fraud claim as to these Defendants. We next consider whether Plaintiffs have sufficiently alleged that the false statements were made with the requisite scienter.

### 2.   Scienter

In order to plead scienter under the PSLRA, Plaintiffs must, as to *each false statement or omission*, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). We consider all of the evidence together in determining whether Plaintiffs have pled sufficient facts to support a strong inference of scienter. <u>Ronconi v. Larkin</u>, 253 F.3d 423, 429 (9th Cir. 2001).

We begin by addressing Plaintiffs' direct evidence of scienter in the form of statements by confidential witnesses. We then discuss Plaintiffs' circumstantial evidence of scienter.

### a.   *Direct Evidence*

Plaintiffs' "direct evidence" of scienter, based on alleged statements of confidential witnesses, is insufficient to establish scienter as to either the Company or the Individual Defendants. First, for the most part, the confidential witnesses' allegations do not suggest that Individual Defendants were aware of the alleged improper practices. <u>See</u>, <u>e.g.</u>, ACC ¶ 56. Second, to the extent that confidential witness accounts tie the improprieties to specific Defendants (<u>see</u>, <u>e.g.</u>, ¶¶ 10, 11, 22, 53, 55, 87, 136, 137), the Plaintiffs fail to allege when the events occurred so as to indicate Defendants' knowledge or deliberate recklessness *at the time the false statements were made*.

The sole allegation indicating a specific time frame involves a meeting during the first week of February 2003, at which Goldenberg and Greenspan are alleged to have "specifically discussed eUniverse's inadequate accounting controls and the fact that the Company was recognizing revenue in violation of GAAP." ACC ¶¶ 10, 22(c), 138. This allegation, too, is inadequate.

First, it is unclear whether this information was obtained from a
confidential informant or from some other source. Second,
Plaintiffs fail to allege facts indicating that based on this
alleged discussion, Defendants Goldenberg and Greenspan should
have been aware of the "scale posed by the problems" so as to
create a strong inference of deliberate recklessness. Guess?,
174 F.Supp.2d at 1076 (finding no indication that internal
reports allegedly reviewed by Defendants "had sufficient grasp of
the scale posed by these problems to create a 'strong inference'
of 'deliberate recklessness.'").

We therefore conclude that Plaintiffs have insufficiently
pled direct evidence of scienter.

### b. *Circumstantial Evidence*

We next consider each of Plaintiffs' allegations of
circumstantial evidence of scienter in turn.

#### (1) Magnitude and Scope of Accounting Violations

Plaintiffs argue that allegations that the Defendants either
knew of or recklessly disregarded eUniverse's violations of
Generally Accepted Accounting Principles ("GAAP"), together with
the magnitude of the Company's restatement,[10] suggest scienter.

GAAP violations resulting in a restatement of earnings are
generally insufficient, absent additional facts suggesting
knowledge or deliberate recklessness, to support a strong
inference of scienter. In re Northpoint Communications Group,
Inc. Sec. Litig., 184 F.Supp.2d 991, 1003 (N.D. Cal. 2001)
("Northpoint I") (finding that 20% overstatement in revenue alone
did not raise strong inference of scienter); see also In re
Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)
("[T]he mere publication of inaccurate accounting figures, or a
failure to follow GAAP, without more, does not establish

---

[10]Plaintiffs allege overstatement of revenue by 5.5%, 12%,
and 15% for the first three quarters of FY03, respectively;
overstatement of net income by 18%, 1231%, and 1405% for the
first three quarters of FY03, respectively; and overstatement of
earnings per share by 18%, 900%, and 1400% for the first three
quarters of FY03, respectively. ACC ¶ 5. We note that the
percentages of overstatement of net income and earnings per share
appear particularly large given the Company's relatively modest
net income and the fact that in the second and third quarters of
FY03, the net income and earnings per share went from positive to
negative.

scienter.") (Alteration in original).  However, some courts have
held that "if pled in detail and read in context, GAAP violations
may support an inference of scienter." Adaptive Broadband, 2002
WL 989478, at *12; see also In re McKesson HBOC Inc. Sec Litig.,
126 F.Supp.2d 1248, 1273 (N.D. Cal. 2000).  "GAAP violations are
particularly credible evidence where a plaintiff provides
specific amounts by which revenue was overstated, dates of
transactions, and/or the identities of customers or company
employees involved." Adaptive Broadband, 2002 WL 989478, at *13;
accord McKesson, 126 F.Supp.2d at 1273.

     Here, as previously explained, the allegations regarding
specific GAAP violations are based on inadequately pled
statements from confidential witnesses.  Moreover, Plaintiffs do
not allege any particular transactions, including the products
involved, the dates, or the identities of customers or employees
that would allow us to "discern whether the alleged GAAP
violations were minor or technical in nature, or whether they
constituted widespread and significant inflation of revenue."
Compare McKesson, 126 F.Supp.2d at 1273 (finding GAAP violations
"powerful indirect evidence of scienter" where the complaint
alleged revenue inflation exceeding 25% in some quarters and
detailed numerous individual transactions involving improper
revenue recognition).

     Accordingly, we will consider eUniverse's restatement only
in conjunction with other circumstantial evidence of scienter.

                  (2)  Motive and Opportunity

     In the Ninth Circuit, motive and opportunity alone are
likewise insufficient to raise a strong inference of scienter.
Silicon Graphics, 183 F.3d at 979.  Moreover, "ordinary and
appropriate corporate objectives," such as securing a line of
credit from a lender or gaining regulatory approval abroad,
cannot normally be considered a motivation for fraud. Lipton v.
Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).

     As evidence of motive to commit securities fraud, Plaintiffs
point to eUniverse's stated goal "to be proactive in order to
narrow the gap between the current market valuation of eUniverse
and that of other publicly traded online companies which enjoy on
a comparable basis significantly larger valuations of P/E
multiples while exhibiting less net income, slower growth rates,
and/or less diversified business models than eUniverse." ACC
¶ 14.  They allege that Defendants sought to increase the
Company's stock price and trading volume so that they could
profit from their large holdings with the Company. Id. ¶ 12.

                              15

The motivations alleged by Plaintiffs are "ordinary and appropriate" business objectives that cannot be used to show scienter. There is nothing improper or suspicious about a company's desire to increase its market valuation so that it is in line with similar companies. Further, the desire to drive up stock prices does not distinguish the Defendants here from all other officers or directors who own stock in their companies.

(3)   Temporal Proximity of Positive
      Statements and Revelation of Bad News

Plaintiffs argue that the close proximity between the January 30, 2003 press release in which the Company bragged of record revenue (ACC ¶¶ 78-79) and the May 6, 2003 announcement of the restatement (ACC ¶ 108) "bolster" the inference of knowledge. However, mere temporal proximity is insufficient to establish scienter absent additional evidence of intent or recklessness. See Ronconi, 253 F.3d at 437.

(4)   Insider Trading

Plaintiffs also argue that allegations of insider trading by Defendants Lipp and Carrigan support a strong inference of scienter. Indeed, "unusual" or "suspicious" insider trading may support an inference of scienter. Silicon Graphics, 183 F.3d at 986. Insider trading is only suspicious, however, "when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Id. We consider (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. Id.

In this case, the amount and percentage of shares sold by insiders do not support an inference of scienter. Plaintiffs allege that in February 2003, Carrigan sold 58% of his holdings for proceeds of $183,684 (ACC ¶ 27), while Lipp sold 44%[11] of his

---

[11]The complaint alleges that Lipp's sale represented approximately 98% of his holdings. ACC ¶26(b). However, eUniverse's 2003 10-K indicates that Lipp had 112,500 shares of exercisable options at the end of FY03. EUniverse RJN Ex. J, at 29. The same document indicates that Lipp exercised 87,500 shares during that fiscal year. Id. Inasmuch as Silicon Graphics, 183 F.3d at 986-87, instructs that we should treat an officer's exercisable stock options as stock shares for purposes of calculating holdings, we conclude that Lipp's sale of 87,500 shares represented approximately 44% of the 200,000 shares he

(continued...)

16

holdings for proceeds of $464,197.68 (ACC ¶ 26). Although viewed
in isolation these percentages would likely be sufficient to
raise suspicion, see <u>Silicon Graphics</u>, 183 F.3d at 987 (stating
that sales of 43.6% and 75.3% of holdings appeared "somewhat
suspicious"), it is significant that the total proceeds from
these sales are relatively small. By comparison, in <u>Silicon
Graphics</u>, the Ninth Circuit found that stock sales of 388,188
shares totaling $13,821,053 in proceeds did not give rise to a
strong inference of scienter, where four of the six defendants
sold only modest percentages of their total holdings and the
officers retained 90% of their collective holdings. <u>Id.</u> at 985-
86.

Similarly, in this case, Lipp and Carrigan were relatively
minor stockholders, neither of whom sold an overwhelming portion
of their shares. Indeed, the sale of stock by Lipp and Carrigan
in February 2003 represented approximately 1% of the total shares
owned by all of the Individual Defendants.[12] The fact that
Greenspan, the largest stockholder and one of the two Defendants
frequently quoted in the complaint, who was presumably in a key
position to know if fraudulent activity was occurring, did not
sell any stock during the class period tends to negate an
inference of fraud. <u>See</u> <u>Vantive</u>, 283 F.3d at 1094 (finding CEO's
sale of 13% of his shares during the class period tended to
negate an inference of fraud since "[i]n his position as CEO and
as the person most quoted in the complaint, [he] was presumably
in the best position to know the 'true' facts."). Further
negating an inference of fraud is the fact that the other often-
quoted Defendant, Varraveto, actually *purchased* additional shares

---

[11](...continued)
owned prior to the sale.

[12]The remaining four Defendants collectively owned more than
9.6 million shares, or approximately one-third of the Company's
outstanding shares: Greenspan owned 8 million shares, Brewer
owned more than 900,000 shares, Goldenberg owned more than
500,000 shares, and Varraveto owned more than 220,000 shares.
ACC ¶ 12.

during the Class Period.[13]   In sum, we find that the amount and percentage of shares sold by insiders do not appear suspicious.

We next consider the timing of the sales. Here, by alleging that the sales occurred approximately two months before the Company first indicated that FY03 financial results may need to be restated Plaintiffs ask us to infer that Lipp and Carrigan sought to "dump" what they knew was artificially inflated stock. However, the fact that other equally (or more) knowledgeable Defendants did not sell at or around the same time leads to the opposite inference. See Vantive, 283 F.3d at 1093 ("Had [the defendant] been selling these shares to 'dump' what he knew was artificially inflated stock, other equally (or more) knowledgeable defendants presumably would have done the same thing.").

The next factor is the Defendants' prior trading histories. In their Opposition, Plaintiffs submit SEC statements showing that neither Lipp nor Carrigan sold any of their holdings in the previous four years. Thus, inasmuch as the stock sales of Carrigan and Lipp are out of line with their prior trading histories, this factor favors an inference of scienter.

We conclude that although the sale of stock was out of line with Lipp and Carrigan's prior trading histories, the amount and percentage of stocks sold and the timing of the sales do not lead to an inference of scienter. Accordingly, we find that the evidence of insider trading does not provide sufficient circumstantial evidence of Defendants' scienter.

Based on the foregoing analysis, we find Plaintiffs' circumstantial evidence of scienter insufficient to support a strong inference of scienter with respect to either the Company or any of the Individual Defendants. Although the size of the restatement combined with the temporal proximity between positive statements and the revelation of bad news may provide some evidence of scienter, even when considered together, they are insufficient to support a *strong* inference of scienter. Inasmuch

---

[13]We do not adopt a blanket rule that there can *never* be an inference of scienter where insiders have purchased stock.   See Holmes v. Baker, 166 F.Supp.2d 1362, 1378 (S.D. Fla. 2001) (finding blanket rule that there can be no inference of scienter where defendants purchased stock would encourage stock purchases to avoid liability for securities fraud).   Rather, where, as here, Plaintiffs allege that certain Defendants were "dumping" stock at the same time as another Defendant was purchasing stock, we will not infer that the sale of stock supports an inference of scienter, while the purchase of stock means nothing.

as Plaintiffs have failed to adequately plead scienter to state a claim under section 10(b) and Rule 10b-5(b), Count One of the complaint must be dismissed.

**B.    Count 2: Violations of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

In addition to their claim under Rule 10b-5(b), Plaintiffs bring a *separate* claim for violation of Rule 10b-5(a) and (c). Under these provisions, it is unlawful to use the mails, interstate commerce, or any facility of the national securities exchange "(a)[t]o employ any device, scheme, or artifice to defraud" or "(c)[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The elements of a claim under Rule 10b-5(a) and (c) are substantially the same as under Rule 10b-5(b). While Rule 10b-5(b) applies to materially misleading statements or omissions, 10b-5(a) and (c) apply to deceptive acts or practices. <u>See In re ZZZZ Best Sec. Litig.</u>, 864 F.Supp. 960, 969-70, 971 (C.D. Cal. 1994). Inasmuch as we have concluded that Plaintiffs' allegations of scienter are insufficient to plead a claim under Rule 10b-5(b), the same analysis applies to Plaintiff's claims under 10b-5(a) and (c). Accordingly, we likewise dismiss Plaintiffs' claims under Count Two.

**C.    Count 3:  Violation of § 20(a) of the Exchange Act Against Individual Defendants**

Plaintiffs assert "control person" liability against each of the Individual Defendants under § 20(a) of the Exchange Act. Under the Act, a control person "[s]hall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). A "control person" is defined as someone "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . ." <u>Id.</u> "Control" is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405. To successfully plead control person liability, Plaintiffs must show (1) an underlying securities violation by the entity that Defendants are alleged to control and (2) that Defendants exercised actual power or control

over the entity.  Howard v. Everex, 228 F.3d 1057, 1065 (9th Cir. 2000).  Plaintiffs need not allege the controlling person's scienter distinct from the corporation's scienter.  Id.[14]

In considering whether a defendant exercises actual power and control over the company, the Ninth Circuit considers factors such as participation in the company's day-to-day affairs (Howard, 228 F.3d at 1065); stock ownership (Paracor Finance, 96 F.3d at 1162); and board membership (America West, 320 F.3d at 945).

Inasmuch as Plaintiffs have failed to sufficiently allege an underlying securities violation, they cannot satisfy the first prong of the § 20(a) analysis.  Even if Plaintiffs could show an underlying violation, however, we would conclude that their allegations of control person liability are insufficient with respect to Defendant Carrigan.

Courts in this circuit have applied the "control person" standard with varying degrees of flexibility.  We note, however, the Ninth Circuit's pronouncements that "[w]hether [a defendant] is a controlling person is an 'intensely factual question,'" Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994), and that "the two-prong test for establishing control should be construed liberally and flexibly."  Wool, 818 F.2d at 1441.  For these reasons, at this stage of the litigation, we will not require Plaintiffs to allege, with particularity, how Defendants controlled the Company.  See In re Cylink Sec. Litig., 178 F.Supp.2d 1077, 1089 (N.D. Cal. 2001) (finding allegation that individual defendants "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised" sufficient to support an inference of control person liability with respect to those

---

[14]Defendants cite Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984) and Durham v. Kelly, 810 F.2d 1500, 1504 (9th Cir. 1987) for the proposition that Plaintiffs must show that the Defendant was a "culpable participant" in order to establish control person liability.  However, in Hollinger v. Titan Capital Corp., 914 F.2d 1564 (9th Cir. 1990), the Ninth Circuit, sitting en banc, held that an investor is not required to show "culpable participation" in order to establish that a broker-dealer is liable as a controlling person for a registered representative's conduct.  Id. at 1575.  The Ninth Circuit has since applied Hollinger in other contexts.  See, e.g., Howard, 228 F.3d at 1066 (applying Hollinger in case involving allegations of artificial inflation of stock prices against company CEO and Chairman).

defendants) (alteration in original); <u>but</u> <u>see</u> <u>McKesson</u>, 126
F.Supp.2d at 1277 (dismissing complaint with leave to amend to
allege with particularity, the manner in which Defendants
exercised day-to-day control over defendants alleged to have
committed section 10(b) violations).

In this case, Defendants Varraveto and Greenspan do not
contest the second prong of the "control person" analysis.  In
any event, we would conclude that the Plaintiffs' allegations of
actual power and control are sufficient with respect to these two
Defendants.  Similarly, Plaintiffs' allegations that Brewer
(1) is involved in the Company's day-to-day operations (ACC ¶
30); (2) owned 900,000 shares of stock, or approximately 3.2% of
the outstanding common stock (ACC ¶ 12), and (3) was a member of
the Executive and Compensation Committees of the Board of
Directors (ACC ¶ 23(a)) are sufficient to allege his actual power
and control over the Company.  Likewise, Plaintiffs' allegations
that Goldenberg was COO of the Company (ACC ¶ 25(a)); that he
owned substantial company stock (500,000 shares or approximately
1.9% of outstanding common stock) (ACC ¶ 12)); and that he was
involved in the day-to-day affairs of the Company (ACC ¶ 30) are
sufficient to state a claim under the second prong of the § 20(a)
analysis.

Defendants Lipp and Carrigan present closer questions.
Although Lipp is not alleged to have been a member of the
Company's Board, his stock holdings of 200,000 shares are
comparable to Varraveto's holdings of approximately 220,000
shares.  Inasmuch as Lipp, as the Vice President and General
Counsel, was a high level officer with the Company, Plaintiffs'
allegations are sufficient to allege that Lipp exercised actual
power and control over the Company.

Carrigan, in contrast, is not alleged to be a top level
officer of the Company or a member of the Board, and is alleged
to have had relatively modest holdings in the Company.[15]
Plaintiffs' bare allegation that Carrigan participated in the
Company's day-to-day affairs is insufficient, on its own, to
establish Carrigan's actual power or control over the Company.

_____

[15]Based on Plaintiffs' allegation that Carrigan's sale of
35,000 shares of stock represented approximately 58% of his
holdings with the Company, Carrigan owned approximately 60,000
shares of Company stock.  <u>See</u> ¶ 139.

**D.   MFRC**

We now turn to Plaintiffs' claims against eUniverse's former accountant, MFRC.  Plaintiffs allege that MFRC (1) issued a false audit report dated June 14, 2002, in connection with the Company's financial statements in its FY02 10-K[16] and (2) is primarily liable for false financial statements included in the Company's quarterly reports for the first three quarters of FY03 because it reviewed and participated in the preparation of these statements.  ACC ¶ 28.  Inasmuch as MFRC does not contest its responsibility for false statements, we limit our analysis to the issue of scienter.

Plaintiffs have failed to plead MFRC's scienter with particularity.  Plaintiffs allege only that MFRC "either knew or was deliberately reckless in not knowing" that eUniverse was overstating its revenue (ACC ¶ 100) because MFRC (1) had access to the information concerning the Company's financial information which if reviewed might have disclosed misstatements (ACC ¶¶ 98-99) and (2) conducted a deficient audit by failing to comply with auditing standards, including failing to disclose internal control deficiencies.  ACC ¶¶ 92, 94, 102.

Allegations that the Defendant had "access" to documents that would have revealed improper revenue recognition are insufficient to raise a strong inference of scienter.  DSAM Global Value Fund v. Altris Software, 288 F.3d 385, 390 (9th Cir. 2002).  Similarly, allegations that accountants conducted a deficient audit do not establish scienter.  Id. ("mere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter").

Plaintiffs' allegation that Defendant announced that it would restate its financial results eight days after it replaced MFRC as its independent auditor (ACC ¶ 28(c)) is likewise insufficient to raise a strong inference of scienter.  Although this fact may support an inference that MFRC was negligent, it does not show that MFRC knowingly or deliberately ignored massive GAAP violations.  Cf. SmarTalk, 124 F.Supp.2d at 517 (finding the

---

[16]For the same reasons that Plaintiffs have failed to allege a false statement with respect to the 2002 Form 10-K with respect to the Individual Defendants, Plaintiffs have likewise failed to allege a false statement with respect to the 2002 Form 10-K with respect to MFRC.

22

fact that new team of auditors found mistakes almost immediately after they replaced old team insufficient to establish scienter).

Plaintiffs also argue that because Greenspan and Varraveto certified that they had disclosed internal control problems and fraud to their auditor, MFRC must have been aware of the facts known to Greenspan and Varraveto. Opposition, at 50. This argument is flawed because it assumes that the certifications were truthful, an assumption that is directly contrary to Plaintiffs' allegations regarding the falsity of these certifications. It is therefore insufficient to establish MFRC's scienter.

We conclude that inasmuch as Plaintiffs have failed to adequately allege scienter, they have failed to plead a securities violation against MFRC under section 10(b) and Rule 10b-5. Accordingly, we dismiss Plaintiffs' claims against MFRC.

### E.   Leave to Amend

Having dismissed Plaintiffs' claims against each of the Defendants, we turn to the question of leave to amend.

In determining whether to grant leave to amend in a securities fraud action, we consider (1) undue delay; (2) bad faith or dilatory motive of the party seeking leave; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party if amendment is allowed; and (5) futility of amendment. Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003). The policy that leave to amend shall be "freely given" is applied with "extreme liberality." Id. Dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment. Desaigoudar v. Meyercord, 223 F.3d 1020, 1026 (9th Cir. 2000).

In this case, Plaintiffs may be able to adequately plead scienter by, among other things, alleging the facts with respect to the confidential witnesses in greater detail. Moreover, Defendants have demonstrated neither undue delay nor bad faith on the part of Plaintiffs nor undue prejudice resulting from the amendment. We grant Plaintiffs leave to amend.

## III. DISPOSITION

Accordingly, Defendants' motions to dismiss are hereby **GRANTED**, with leave to Plaintiffs to amend within thirty (30)

days of this order.[17]  In amending the complaint, Plaintiffs are instructed to carefully consider the court's order, and to remove claims or defendants for which and as to whom they are unable to plead facts with the requisite detail.

   **IT IS SO ORDERED.**

**MINUTES FORM 11**
**CIVIL-GEN**       **Initials of Deputy Clerk**_____

---

  [17]In light of this ruling, Defendant Varraveto's motion to strike is hereby **DENIED** as moot.